**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GARY WIRT and
QUANTUM TECHNOLOGIES, INC.,

        Plaintiffs,

                                         Case No. 04-73753

v.                                       Hon. Gerald E. Rosen

TICONA POLYMERS, INC. and
CELANESE CORPORATION,

        Defendants.

_____/

**OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     September 14, 2006

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I. INTRODUCTION

Plaintiff Gary Wirt and a company he formed, Plaintiff Quantum Technologies,

Inc., commenced this suit in a Michigan circuit court on September 2, 2004, alleging that

the Defendant companies, Ticona Polymers, Inc. and Celanese Corporation, breached

their obligations to pay Plaintiffs certain commissions, expenses, and other amounts

allegedly owed under the terms of the parties' contract.[1]  Defendant removed the case to

---

[1]Defendant Celanese Corporation evidently is a precursor entity to Defendant Ticona
Polymers. This entity apparently no longer exists, was never served with the complaint, and has
never appeared as a party to this action.  Accordingly, the Court will refer to Ticona Polymers as

this Court on September 24, 2004, citing diversity of citizenship among the parties.

Defendant now seeks summary judgment in its favor as to most, but not all, of the theories of recovery advanced in Plaintiff's complaint.  Specifically, Defendant argues (i) that the parties' agreement did not call for the payment of commissions, but instead provided that Plaintiff would be compensated at a flat hourly rate; (ii) that Plaintiff's entitlement to a termination fee lapsed along with the parties' most recent written agreement, which expired by its own terms several months before Defendant terminated the parties' relationship; and (iii) that Plaintiff's claim for reimbursement of certain expenses incurred in 2001 was properly denied as untimely submitted to the company for payment.[2]  In response, Plaintiff maintains (i) that he secured an oral agreement for the payment of commissions; (ii) that, in the alternative, the absence of such an oral agreement necessarily means that the parties were bound by their prior written agreement, which called for the payment of a termination fee; and (iii) that the terms of the parties' agreement did not justify Defendant's refusal to honor any purportedly delayed requests for reimbursement of expenses.

Having reviewed the parties' briefs in support of and opposition to Defendant's motion, the exhibits accompanying these briefs, and the record as a whole, the Court finds

the sole "Defendant" throughout the balance of this opinion.  Similarly, because the claims of Plaintiff Gary Wirt and his company, Quantum Technologies, are identical, and because the interests of these two parties are fully aligned, the Court will refer to Mr. Wirt as the sole "Plaintiff" throughout the balance of this opinion.

[2]Defendant does not seek summary judgment as to certain consulting fees and expenses that allegedly remained outstanding and unpaid upon the termination of the parties' relationship.

2

that the relevant allegations, facts, and legal arguments are adequately presented in the written record, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide Defendant's motion "on the briefs."  <u>See</u> Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  This Opinion and Order sets forth the Court's rulings.

## II.  <u>FACTUAL BACKGROUND</u>

Plaintiff Gary Wirt is the sole shareholder and employee of Plaintiff Quantum Technologies, Inc.  Defendant Ticona Polymers, Inc. manufactures engineering resins for use in a variety of applications, including safety systems such as automotive air bags.  In May of 1996, Plaintiff and Defendant entered into a "Contractor Consulting Agreement," under which Plaintiff agreed to provide "consulting services . . . consist[ing] of . . . marketing and technical expertise for polyester product lines air bag applications." (Defendant's Motion, Ex. 1, Contractor Consulting Agreement at 1.)  The parties' relationship continued from that point until Defendant terminated it in January of 2004.

**A.    The Terms of the Parties' Contractual Relationship**

Under the parties' initial agreement, Plaintiff was compensated "at a rate of $700 per 7-hour day (or a pro rata amount for any partial day)," and was reimbursed for any travel-related or out-of-pocket expenses incurred in the course of providing consulting services to Defendant.  (<u>Id.</u>)  The agreement further provided:

> At the end of each two-week or one-month period (Contractor's option) during the duration of this Agreement, the Contractor shall submit a statement to the Company reflecting the number of days during that month

3

> in which he provided consulting services for the Company and the fee
> therefore, together with an itemized list of his expenses for the month, if
> any.  Within thirty days of such submission, the Company shall remit to the
> Contractor, his fee and reimbursed expenses.  For the company to make
> reimbursement for expenses they must, to the extent reasonable, be
> supported by documentation and be in accordance with the provisions of
> this paragraph.

(Id. at 2.)

This initial agreement had a one-year term, running from May 16, 1996 to May 15,

1997, with Defendant retaining an option to extend it "on a year to year basis with the

same, or new, terms."  (See id. at 1.)  Defendant also reserved the right, however, "to

terminate this Agreement without notice at any time when, in its sole judgment, the

Contractor has neglected his duties, engaged in misconduct or has breached [the

confidentiality or non-disclosure provisions] of this Agreement."  (Id. at 2.)  In contrast, if

Defendant terminated the agreement "without cause," it was obligated to pay to Plaintiff a

"cancellation fee equivalent to 30 days remuneration."  (Id.)  Finally, the agreement

provided that "[n]o waiver of a breach of any term or condition of this Agreement shall be

deemed to constitute the waiver of any other breach of the same or any other term or

condition," and that the agreement as a whole could not be "waived, modified or

terminated except in writing, signed by the parties."  (Id. at 4.)

When this initial contract expired by its terms on May 15, 1997, the parties

nonetheless continued their relationship beyond that point in accordance with the

provisions of this agreement, with Plaintiff continuing to be compensated at the same flat

hourly rate.  As Plaintiff explained at his deposition, during this period after the

4

expiration of the parties' initial contract, he understood that he would be compensated "the same as always."  He further testified:

> We had a verbal — I mean, we all had an agreement that this was simply . . . the way they did business, it took them a long time to get everything reduced to writing and signed [and] back in place, but it — I was assured that nothing had changed and to continue doing what we were doing.

(Defendant's Motion, Ex. 2, Plaintiff's Dep. at 97.)

As the parties discussed the terms of a successor agreement during this period, Plaintiff began to advocate a different, commission-based compensation scheme.  In Plaintiff's view, his efforts on behalf of Defendant had resulted in increased sales and additional customers, and he sought a compensation scheme that would reward these efforts.  Nonetheless, when the parties eventually entered into their next written agreement, an "Addendum" signed in September of 1998, they retained their previous flat-rate hourly compensation scheme and merely extended the term of the initial agreement.  (See Defendant's Motion, Ex. 4, Addendum.)  As a result, the parties' relationship continued to be governed by the provisions of their initial contract, with the term of this agreement now extended until March 31, 1999.  (See id.)[3]

This pattern continued throughout the parties' subsequent dealings.  Specifically, on two additional occasions, the parties' written agreement expired but then was retroactively renewed through an addendum executed months or even years later.  First,

---

[3]Although this addendum was not executed until September of 1998, it was made retroactive to the expiration of the initial contract on May 15, 1997.  (See id.)

after the agreement expired on March 31, 1999, the parties signed a "Second Addendum"
in May of 1999 that retroactively extended the term of their written contract to encompass
the period between March 31, 1999 and December 31, 1999.  (See Defendant's Motion,
Ex. 5, Second Addendum.)  Then, after this agreement expired at the end of 1999, the
parties executed a "Third Addendum" in the spring of 2002 that retroactively extended
their written contract through March 31, 2003.  (See Defendant's Motion, Ex. 6, Third
Addendum.)  Despite Plaintiff's continuing efforts throughout this time to obtain a
commission-based compensation scheme, these addendums left the substantive terms of
the parties' initial agreement unchanged, including the provision calling for Plaintiff to be
paid at a flat hourly rate.

When the thrice-extended agreement expired on March 31, 2003, Plaintiff again
sought a change to commission-based compensation.  Accordingly, either at
management's request or of his own initiative, Plaintiff drafted a proposed contract that
entitled him to receive six percent of Defendant's "gross resin sales revenue in the safety
systems market," as well as reimbursement of his travel-related expenses.  (See Plaintiff's
Response, Ex. 6, Proposed Sales and Technical Representative Agreement at 1.)  Upon
the termination of this proposed agreement, Plaintiff was to continue to receive "life of
the part" commissions on sales he procured, (see id.), but the contract did not otherwise
call for any sort of severance or termination payment.

As the parties' written agreement came to an end on March 31, 2003 and they
discussed the terms of a possible extension, Plaintiff testified that he was told by

6

Defendant's director of marketing, Fred Daniell, that "[w]ithout any agreement, there would be no change" in his method of compensation.  (Plaintiff's Dep. at 144.)  He further testified that he had "no idea" who would make the decision on Defendant's behalf whether to adopt a commission-based compensation scheme, and that he was advised by one management official, Defendant's automotive market manager Thomas Miller, that "the business unit and the legal department" would need to review any proposed agreement prior to its approval.  (Id. at 144-45.)  Nonetheless, Plaintiff stated that he was assured for "weeks and months" by several members of Defendant's management that his proposed contract "would be signed and returned to me."  (Id. at 151.)  These assurances stopped short, however, of an express promise or representation that Defendant would pay commissions at the six-percent rate proposed by Plaintiff.  (See id. at 166.)

Throughout this post-expiration period, Plaintiff never was told that Defendant's management might be considering a commission-based arrangement different from the one he had proposed.  (See id. at 151.)  Neither did anyone indicate to Plaintiff that Defendant might entertain a commission-based compensation scheme at a rate different from the six percent that Plaintiff was seeking.  (See id. at 165.)  The record indicates, however, that various members of Defendant's management considered the possibility of a commission-based scheme and discussed the terms of a possible counter-offer to Plaintiff's proposal, including the imposition of various conditions that Plaintiff would have to satisfy in order to receive commission payments.  (See, e.g., Defendant's Motion,

Ex. 3, Daniell Dep. at 119-26; Plaintiff's Response, Exs. 7, 8.)  Alternatively, certain

members of Defendant's management evidently were considering whether to terminate

the relationship with Plaintiff, as part of a more general effort to reduce or eliminate the

company's reliance on outside contractors.  (See, e.g., Daniell Dep. at 145.)

Ultimately, Defendant never did sign the proposed contract submitted by Plaintiff,

nor did the company otherwise execute, or even propound, a written agreement calling for

Plaintiff to be paid under a commission-based scheme.  Rather, in November of 2003,

Plaintiff was told that Defendant was terminating its relationship with him.  Although he

was advised shortly thereafter that this was "a mistake," (Plaintiff's Dep. at 167), Plaintiff

again was told in January of 2004 that the parties' relationship had been terminated.

**B.      Defendant's Refusal to Pay Plaintiff's 2001 Expenses**

Although Plaintiff's efforts at recovery in this case are based principally upon his

claimed entitlement to commissions and/or a termination fee, he also contends that

Defendant breached an obligation to reimburse him for certain expenses incurred in 2001.

In particular, the record includes a number of expense reports prepared by Plaintiff for the

months of February through December of 2001.  Certain of these reports are undated, and

others are dated January 2, 2003.  The report for July of 2001, in contrast, appears to be

dated January 2, 2002.

According to Defendant, Plaintiff first submitted all of these expense reports in

January of 2003, seeking reimbursement for his various expenditures dating back to

February through December of 2001.  Defendant's director of marketing, Frank Daniell,

8

rejected this request for reimbursement, concluding that Plaintiff's expense reports were "grossly overdue" and "untimely." (Daniell Dep. at 153-54.) In an affidavit accompanying his response to Defendant's motion, however, Plaintiff asserts that he first submitted the relevant expense reports "in early 2002," and that, "[u]ntil the rejection of the expenses at issue, I was never told that late expenses would not be paid." (Plaintiff's Response, Ex. 1, Plaintiff's Aff. at ¶ 20.) He further cites instances in which he was "told by Ticona personnel not to submit monthly expenses but rather to hold the expenses and submit them later to help Ticona's cash flow." (Id.) Accordingly, Plaintiff also seeks in this case to recover these 2001 expenses that Defendant refused to reimburse back in 2002 or early 2003.

## III. ANALYSIS

### A.    The Standards Governing Defendant's Motion

Through the present motion, Defendant seeks summary judgment in its favor on most, but not all, of the breach-of-contract theories of recovery advanced in Plaintiff's complaint. In particular, Defendant seeks an award of summary judgment in its favor as to Plaintiff's claims for commissions, a termination fee, and reimbursement of his 2001 expenses.[4] Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[4]By contrast, Defendant does not presently challenge Plaintiff's claim for certain consulting fees and expenses arising from the final months of the parties' relationship in late 2003 and early 2004.

9

the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases — <u>Matsushita Electrical Industrial Co. v. Zenith

Radio Corp.</u>, 475 U.S. 574 (1986), <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986),

and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) — ushered in a "new era" in the federal

courts' review of motions for summary judgment.  These cases, in the aggregate, lowered

the movant's burden in seeking summary judgment.[5]  According to the <u>Celotex</u> Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element essential
> to that party's case, and on which that party will bear the burden of proof.

<u>Celotex</u>, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles

governing motions for summary judgment.  These principles include:

> * Cases involving state of mind issues are not necessarily inappropriate for
> summary judgment.
>
> * The movant must meet the initial burden of showing "the absence of a genuine
> issue of material fact" as to an essential element of the non-movant's case.  This
> burden may be met by pointing out to the court that the respondent, having had
> sufficient opportunity for discovery, has no evidence to support an essential
> element of his or her case.
>
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the

---

[5]"[T]aken together, these three cases signal to the lower courts that summary judgment
can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful
trials."  10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, <u>Federal Practice &
Procedure</u>, § 2727, at 468 (1998) (footnote omitted).

movant's denial of a disputed fact, but must "present affirmative evidence in order
to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that
it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the
respondent's evidence. The respondent must "do more than simply show that
there is some metaphysical doubt as to the material facts." Further, "[w]here the
record taken as a whole could not lead a rational trier of fact to find" for the
respondent, the motion should be granted. The trial court has at least some
discretion to determine whether the respondent's claim is plausible.

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989). See also

Nernberg v. Pearce, 35 F.3d 247, 249 (6th Cir. 1994). The Court will apply these

standards in resolving Defendant's motion.

**B.      Plaintiff Has Failed to Establish a Contractual Entitlement to Commissions.**

While Plaintiff alleges that Defendant breached the parties' agreement in a number

of respects, his principal claim is that Defendant failed to satisfy a purported contractual

obligation to pay a six-percent commission on sales Plaintiff procured for the company.

As is clear from the foregoing recitation of facts, and as Plaintiff concedes in his response

to Defendant's summary judgment motion, the parties never executed a written contract

calling for the payment of such commissions. Nonetheless, Plaintiff asserts that the

parties orally agreed to a commission-based compensation scheme. The Court agrees

with Defendant, however, that the record lacks any evidence of such an agreement, but

instead indicates, at best, that the parties shared a tentative and indefinite understanding

that such a commission-based scheme would be incorporated into a forthcoming (but

11

never realized) written contract.

At the outset, the Court observes that, despite the parties' various arguments in their briefs, the thrice-extended written agreement between the parties has little or no bearing upon the outcome of Plaintiff's claim for commissions. There is no question, and Plaintiff does not contest, that prior to the expiration of the written contract on March 31, 2003, Plaintiff's compensation was governed by the flat-rate hourly scheme set forth in this agreement. It is also clear that this written contract was never again modified, extended, or reinstated through any writing signed by the parties between the contract's expiration on March 31, 2003 and the termination of the parties' relationship in January of 2004. Nor could this contract have been altered by oral agreement of the parties, in light of its express provision prohibiting any "waive[r], modifi[cation] or terminat[ion] except in writing, signed by the parties." (Defendant's Motion, Ex. 1, Contractor Consulting Agreement at 4.) Accordingly, this written agreement having lapsed in accordance with its own terms, it is largely immaterial to a determination whether the parties agreed to a commission-based compensation scheme during the subsequent period of March 31, 2003 to January of 2004.[6]

In addition, and despite Plaintiff's assertions to the contrary, the Court does not view the parties' "past practice" as particularly relevant to a determination of Plaintiff's entitlement to commissions. Plaintiff characterizes the parties' overall relationship as one

--------

[6]The one limited exception to this general proposition is discussed below.

in which they "operate[d] first under an oral agreement and then subsequently reduce[d] the oral agreement to a signed writing months or even years later."  (Plaintiff's Response at 2.)  While this is empirically accurate, it says nothing about the **terms** of the oral agreements under which the parties operated until they reduced these agreements to writing.  Once they executed each such written agreement and made it retroactive to the expiration of the last such agreement, it would then, of course, be possible to identify with certainty the terms that governed the parties' relationship.  Yet, in the absence of such an after-the-fact written agreement — and, as explained, none exists for the relevant period after March 31, 2003 — this usual "practice" of eventually reducing the parties' oral understanding to writing does not assist in ascertaining the precise terms to which the parties might have orally agreed in the interim.[7]

Against this backdrop, the Court turns to the relevant inquiry — namely, whether the record, viewed in a light most favorable to Plaintiff, would support his contention that Defendant orally agreed to a commission-based compensation scheme following the March 31, 2003 expiration of the parties' written agreement.  There is no question that Plaintiff **proposed** such an arrangement, both verbally at various points in the parties' relationship and in a written proposed agreement submitted to Defendant's management at around the time the parties' contract expired in March of 2003.  In order to defeat Defendant's request for summary judgment on this issue, then, Plaintiff must point to

---

[7]As noted below, however, another aspect of the parties' past practice has at least some bearing upon the proper disposition of Plaintiff's claims in this case.

13

evidence that Defendant ***accepted*** this offer of a commission-based method of payment. See, e.g., Ford Motor Co. v. Kahne, 379 F. Supp.2d 857, 868 (E.D. Mich. 2005) (recognizing the familiar principle of Michigan law that "[i]n order to form a valid contract there must be a meeting of the minds on all the material facts," which requires "mutual assent on all essential terms" (internal quotation marks and citations omitted)); Kamalnath v. Mercy Memorial Hospital Corp., 194 Mich. App. 543, 487 N.W.2d 499, 503 (1992) ("Mere discussions and negotiation, including unaccepted offers, cannot be a substitute for the formal requirements of a contract.").

One way that this acceptance can be shown is through a party's actual conduct evidencing its assent to the other party's offer. See, e.g., Pakideh v. Franklin Commercial Mortgage Group, Inc., 213 Mich. App. 636, 540 N.W.2d 777, 780 (1995). In this case, however, Defendant correctly observes that its conduct evidenced its apparent ***rejection*** of a commission-based compensation scheme. Throughout the parties' entire relationship, including the period after the expiration of their written agreement in March of 2003, Plaintiff submitted invoices for consulting fees computed at a flat hourly rate and Defendant compensated Plaintiff in accordance with this hourly scheme.[8] Plainly, then,

_____

[8]Viewed in this light, the parties' past practice tends to undermine, rather than support, Plaintiff's claim for commissions. In particular, each and every time the parties' written agreement expired, they continued to proceed in accordance with the terms of their expired agreement. This seemingly suggests a shared understanding that the parties' relationship would continue to be governed by the terms of their expired written agreement until such time as they entered into a new written contract with different terms. Indeed, as discussed in greater detail below, Michigan law recognizes a rebuttable presumption that parties who continue to perform in accordance with the terms of an expired contract are bound by an implied agreement reflecting these same terms. See, e.g., Paxson v. Cass County Road Commission, 325 Mich. 276, 38

14

this avenue of demonstrating Defendant's acceptance of a commission-based scheme is

unavailing to Plaintiff here.

Plaintiff suggests, however, that he has a much more direct method of establishing

Defendant's acceptance of his commission-based proposal.  Plaintiff points, in particular,

to the repeated assurances he purportedly received from company officials over a period

of "weeks and months" that the proposed contract he had submitted "would be signed and

returned to me."  (Plaintiff's Dep. at 151.)  While Defendant never actually delivered on

this promise, Plaintiff nonetheless insists, in essence, that he secured an "agreement to

agree," which, under Michigan law, "may be just as valid as any other contract."  Kahne,

379 F. Supp.2d at 869 (internal quotation marks and citations omitted).

The record in this case is insufficient as a matter of law, however, to support this

claim of an "agreement to agree."  Such an agreement, just like any other sort of contract,

may be enforced only if the parties specify and mutually assent to all "material and

essential terms, leaving none to be agreed as a result of future negotiations."  Kahne, 379

F. Supp.2d at 869 (internal quotation marks and citations omitted); see also Hansen v.

Catsman, 371 Mich. 79, 123 N.W.2d 265, 266 (1963) ("If the document or contract that

the parties agree to make is to contain any material term that is not already agreed on, no

contract has yet been made; and the so-called 'contract to make a contract' is not a

_____

N.W.2d 315, 317 (1949); Cloverdale Equipment Co. v. Manitowoc Engineering Co., 964 F.
Supp. 1152, 1162 & n.10 (E.D. Mich. 1997), aff'd, 149 F.3d 1182 (6th Cir. 1998).  Any such
implied contract in this case, of course, would have called for an hourly compensation scheme.

15

contract at all." (internal quotation marks and citations omitted)).  Yet, Plaintiff has

acknowledged that he never obtained Defendant's assent to at least one term of his offer

that was undeniably material — namely, the *rate* at which commissions would be paid,

which Plaintiff proposed should be six percent.  (See Plaintiff's Dep. at 166.)  Indeed, it is

quite clear from the materials accompanying Plaintiff's response to Defendant's motion

that the company was internally debating the appropriate rate for a commission-based

compensation scheme, with Defendant's management at one point endorsing a

counterproposal calling for a sliding-scale commission of four percent in the first year

following a sale, three percent in the second year, and two percent in the third year.  (See

Plaintiff's Response, Ex. 8.)[9]  Absent the parties' agreement upon this essential term that

would determine the actual amount of Plaintiff's compensation, it cannot be said that

Plaintiff and Defendant reached an "agreement to agree" upon a commission-based

compensation scheme.

More generally, the record of Defendant's internal deliberations defeats any claim

that the company had accepted Plaintiff's proposal, with only the ministerial act of

signing remaining to formalize the parties' meeting of the minds.  Most notably, this

record reveals that Defendant's management was meeting in July and August of 2003 to

discuss the terms of a contract proposal to Plaintiff, several months *after* Plaintiff

---

[9]Plaintiff concedes that no such counteroffer was ever conveyed to him — indeed, he professes his lack of awareness that Defendant's management was even considering a commission-based scheme that differed from the one he had proposed.  (See Plaintiff's Dep. at 151, 165.)  It follows that he never accepted any counterproposal calling for the payment of commissions at something other than his proposed six-percent rate.

16

submitted his proposed contract to Defendant.  Evidently, then, Defendant still viewed the terms of Plaintiff's contract as an open issue rather than a done deal.  And, of course, the terms being considered at these meetings differed in various respects from those contained in Plaintiff's proposal — apart from a lower, sliding-scale commission rate, Defendant's management also was discussing certain conditions that Plaintiff would have to satisfy in order to receive commission payments.  (See Plaintiff's Response, Exs. 7, 8.)  Finally, Plaintiff himself acknowledges that he had "no idea" who within Defendant's management would make the decision on a commission-based compensation scheme, and that he was told by at least one management official that "the business unit and the legal department" would need to review his proposal before it could be approved.  (Plaintiff's Dep. at 144-45.)  Under this record, Plaintiff cannot establish a meeting of the minds as to his proposal that he be paid a six-percent commission on sales he procured in the safety systems market.

**C.     Plaintiff Is Not Entitled to a Termination Fee Under the Parties' Expired Written Contract.**

In the event that he is unable to establish an agreement to pay commissions, Plaintiff argues that he is entitled to the "cancellation fee" mandated under the parties' initial written agreement in the event that Defendant terminated the agreement "without cause."  (Defendant's Motion, Ex. 1, Contractor Consulting Agreement at 2.)  After all, Plaintiff reasons, if no commission-based agreement was reached, then it follows that "the parties' original agreement must [have] be[en] in place" instead.  (Plaintiff's Response at

17

11.)  This reasoning, however, ignores the express language of the contract under which

Plaintiff seeks to recover — a contract which had expired by its own terms, and which

had not been renewed in writing, whether for a fixed or an indefinite period, at the time

that Defendant terminated Plaintiff's services in January of 2004.  Nor, as discussed

below, has Plaintiff produced evidence of an oral or implied contract that mandated the

payment of a cancellation fee.

As observed earlier, the parties' written agreement has only a limited bearing upon

the terms of their relationship after the contract expired on March 31, 2003.  After this

date, the parties never executed any document that might have modified, extended, or

reinstated their expired contract.  Nor could the parties have achieved this result through

any sort of oral agreement, in light of the contract's express provision prohibiting any

"waive[r], modifi[cation] or terminat[ion] except in writing, signed by the parties."

(Defendant's Motion, Ex. 1, Contractor Consulting Agreement at 4.)  Accordingly, the

Court confirms its earlier conclusion that the written contract generally ceased to govern

the parties' relationship after its expiration on March 31, 2003.

This leaves only the possibility of some sort of oral or implied agreement that

would require the payment of a cancellation fee upon Defendant's termination of the

parties' relationship.  As to the former possibility, however, there is no evidence in the

record that the parties ever discussed this subject, much less reached a meeting of the

minds upon it, as a matter separate and apart from the terms they had agreed in the past to

incorporate into their written (but since expired) contract.  Moreover, even assuming the

18

parties orally agreed as a general proposition that their relationship would continue to be governed by the terms of their expired contract, there is no evidence of any discussion of the duration of this arrangement.  As discussed below, absent an oral agreement or some other basis to fill in this durational term, it would be problematic to conclude that Defendant was required to pay a cancellation fee no matter when it chose to terminate this posited oral contract.

An implied agreement, in contrast, would appear to provide a more promising avenue for Plaintiff to recover a cancellation fee.[10]  As noted, the parties continued to perform in accordance with the written contract's provisions even after this contract had expired.  Under Michigan law, this continued performance gives rise to a rebuttable presumption that the parties were bound by an implied agreement with terms the same as those set forth in the expired contract.  See Paxson, 38 N.W.2d at 317; Cloverdale Equipment, 964 F. Supp. at 1162 & n.10.  Arguably, then, Defendant would be obligated under this implied contract, just as it was obligated under the written contract, to pay a cancellation fee if it terminated the parties' relationship without cause.

Yet, there is no basis in the record for supplying one crucial term of such an implied contract — namely, the ***duration*** of this agreement.  In cases where the parties'

---

[10]Notably, Plaintiff has not advanced any sort of implied contract theory in his submissions to the Court.  To the contrary, while Defendant addresses implied contract principles in its brief in support of its motion, (see Defendant's Motion, Br. in Support at 15-16), Plaintiff cursorily dismisses this as a mere rehash of Defendant's argument regarding the possible existence of an oral agreement, opining that Defendant has "present[ed] the same argument twice in its brief," (Plaintiff's Response at 10.)

19

past contracts consistently lasted for the same definite period — a one-year term, for

example — the courts have had no difficulty in concluding that the implied contract that

arises from continued performance should encompass the same period reflected by the

parties' past practice.  See Paxson, 38 N.W.2d at 318 (citing the parties' consistent past

practice of "hiring [the plaintiff] . . . by the year"); Cloverdale Equipment, 964 F. Supp at

1162 (noting that the parties "had established a formal course of dealing" through written

agreements "which were *always* for a one-year term").  Here, in contrast, the parties' past

practice was anything but consistent — their prior written agreements had spanned one

year (May 16, 1996 through May 15, 1997), just over twenty-two months (May 16, 1997

through March 31, 1999), nine months (April 1, 1999 through December 31, 1999), and

thirty-nine months (January 1, 2000 through March 31, 2003).  Under this record, it

would be impossible to determine the precise duration of the implied contract under

which the parties arguably operated following the expiration of their written agreement.

This indefiniteness defeats Plaintiff's claim for a cancellation fee under an implied

contract theory.  Under the parties' written agreement, Defendant was obligated to pay

this fee only if it terminated the parties' relationship without cause.  Plainly, however, no

such "without cause" termination would occur if the agreement simply expired of its own

terms — by the very nature of a contract for a definite duration, both sides are free to

walk away at the conclusion of this definite term.  What Plaintiff bargained for, then, was

Defendant's promise that it would not terminate the agreement ***prematurely*** and without

cause — the contract, in effect, mandated a payment of liquidated damages in the event

that the company did so.  Yet, because the parties' implied contract following the expiration of their written agreement lacked a precise duration, Defendant simply could not have prematurely terminated this implied contract.  It follows that Defendant was under no obligation to pay a cancellation fee when it terminated — or, more accurately, when it declined to renew through continued performance — the implied contract that arguably arose following the expiration of the parties' written agreement.

The unpublished decision in Switzer v. Hayes Wheels International, Inc., 205 F.3d 1342, 2000 WL 92273 (6th Cir. Jan. 21, 2000), illustrates still another defect in the application of an implied contract theory here.  In that case, similar to this one, the parties entered into an initial three-year written agreement in 1987, and then executed two subsequent written amendments in 1990 and 1993 through which they extended their initial agreement for two additional three-year periods.  When the extended agreement eventually expired in March of 1996, the plaintiff continued to work without a contract until the defendant company terminated the relationship about five months later.  The plaintiff claimed that he was entitled to severance benefits in accordance with the terms of the parties' written agreement, but the defendant argued that the plaintiff had no such contractual rights upon the expiration of this written agreement.

The Sixth Circuit held that the plaintiff was not entitled to recover severance benefits under an implied contract theory.  The Court reasoned:

> Under specific circumstances, Michigan law permits a contract to be implicitly renewed.  However, if there are contrary intentions, a contract does not continue and is not implicitly renewed.

21

We conclude that the 1987 Agreement and its amendments did not implicitly renew because the parties did not intend such a result. The amendments to the 1987 Agreement are clear that all benefits extended to Plaintiff end on March 31, 1996, and that all modifications must be in writing. The parties' past practice supports such a finding because the 1987 Agreement . . . and the 1990/1993 Amendments were all written contracts that expressed the period of employment in clear and unambiguous terms.

Switzer, 2000 WL 92273, at *3 (citations omitted).[11]

Precisely the same can be said here. The parties' written contract expressly provided that any modification must be in writing, and the parties executed three written addendums in accordance with this provision. In both their initial contract and in each addendum, they expressed their agreement that their relationship spanned a specific term and would end on a specific date. Under the reasoning of Switzer, then, the consistent past practice of the parties did not reflect an unstated, implicit intent to renew their expired contract. Instead, this past practice evidenced the parties' intent that their contract would be renewed only upon the execution of a written addendum — an addendum that always was forthcoming in the past, but that was never achieved in the final period between April of 2003 and January of 2004. This past practice arguably overcomes the rebuttable presumption that the parties continued to be bound by an

_____

[11]Notably, the Court found that any such implied renewal would have encompassed a three-year period, in light of the parties' consistent past practice of renewing their contract in three-year increments. See Switzer, 2000 WL 92273, at *3. Such a contract, in the Court's view, would have run afoul of Michigan's statute of frauds, which requires "that a contract not to be performed within one year must be in writing." 2000 WL 92273, at *3 (citing Mich. Comp. Laws § 566.132(1)(a)). Similarly, in this case, any implied durational term in the parties' post-expiration agreement presumably would have to be for a year or less in order to comply with the statute of frauds.

22

implied agreement once their written contract expired.  At a minimum, this past practice reveals that the parties never reached a meeting of the minds as to the duration of any successor agreement — if they had, their past practice indicates that they would have set down this agreement in writing.  Accordingly, Defendant did not prematurely terminate a contract, whether express, oral, or implied, such that it was obligated to pay a cancellation fee.

### D.     Plaintiff Has Failed to Produce Evidence Rebutting Defendant's Showing of a Proper Refusal to Reimburse Plaintiff for His Untimely Submitted 2001 Expenses.

The final issue raised in Defendant's summary judgment motion concerns Plaintiff's claim for reimbursement of expenses he incurred in 2001.  Defendant argues that it properly denied Plaintiff's request for reimbursement of these expenses on the ground that he violated a contractual requirement to submit such requests on a monthly basis as the expenses accrued, and instead waited until early 2003 to submit expense reports covering the entire period from February to December of 2001.  In response, Plaintiff contends that he submitted the pertinent reports in 2002 rather than 2003, that the contract does not preclude reimbursement of untimely submitted expenses, and that, in any event, Defendant cannot insist upon timely submission where the company, at times, asked Plaintiff to submit his expense reports less frequently, and other times failed to promptly reimburse him in accordance with the terms of the parties' contract.  Upon considering these competing contentions in light of the record, the Court finds that Defendant has the better of the argument on this point.

23

As noted above, the parties' initial contract provided that "[a]t the end of each two-week or one-month period," at Plaintiff's option, Plaintiff was to submit to Defendant a statement of his consulting services during that period "together with an itemized list of his expenses" for that period.  (Defendant's Motion, Ex. 1, Contractor Consulting Agreement at 2.)  According to Defendant, Plaintiff did not prepare and submit expense reports for the period from February to December of 2001 until January of 2003.  Defendant's director of marketing, Fred Daniell, testified that the company declined to reimburse Plaintiff for these expenses on the ground that the supporting expense reports were "grossly overdue, more than 6 or 12 months old."  (Defendant's Motion, Ex. 3, Daniell Dep. at 153-54.)  In support of its present motion, Defendant contends that Plaintiff cannot now seek to recover these 2001 expenses under a breach-of-contract theory, where Defendant properly relied on the above-quoted contractual requirement of timely submission in denying Plaintiff's request for reimbursement of these expenses.[12]

Plaintiff challenges this contention on both factual and legal grounds.  First, he asserts that an issue of fact remains as to whether he submitted his 2001 expense reports in January of 2003, as Defendant contends, or in early 2002, as he claims in an affidavit.  (See Plaintiff's Response, Ex. 1, Plaintiff's Aff. at ¶ 20.)  Yet, even accepting Plaintiff's

---

[12]The Court notes that the parties' written contract was in force when Plaintiff incurred the expenses at issue, in light of the third addendum executed by the parties that extended the contract through the period from December 31, 1999 to March 31, 2003.

24

assertion in his affidavit,[13] a submission in early 2002 would, at best, be timely only as to those expenses incurred in December of 2001 — any expense reports for periods earlier in 2001 would still have been submitted outside the one-month window specified in the contract. Moreover, even as to the December 2001 expenses, the only report of these expenses that is contained in the record is dated January 2, 2003, over a year after the expenses were incurred.[14] Although Plaintiff suggests in his response to Defendant's motion that he "re-submitted" certain expense reports in 2003 after Defendant failed to pay these expenses when requested to do so in 2002, (see Plaintiff's Response at 12), he had not cited any record evidence in support of this claim of "re-submission," much less provided a copy of any December 2001 expense report that could have been part of an initial submission in early 2002. Accordingly, Plaintiff has failed to identify an issue of

---

[13]This assertion arguably contradicts Plaintiff's prior deposition testimony on the same subject, and thus cannot be relied upon to create an issue of fact in opposition to Defendant's summary judgment motion. See Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986); see also Penny v. United Parcel Service, 128 F.3d 408, 415 (6th Cir. 1997) (declining to consider an affidavit where "a reasonable jury would know" that it could not be reconciled with the plaintiff's prior, detailed deposition testimony). At one point in his deposition, Plaintiff recounted an incident in which he submitted "almost a year" of expense reports at one time and was told that these expenses could not be reimbursed "because of the timing." (Plaintiff's Dep. at 115.) Later, Plaintiff was shown a packet of expense reports that he had produced during discovery, and he confirmed his belief that these were, in fact, the reports in question that he had produced all at once and that Defendant had rejected as untimely submitted. (See id. at 168.) These reports have been provided to the Court as exhibit 7 to Defendant's motion, and, as discussed earlier, most of these reports are dated January 2, 2003. As a matter of simple logic, then, Plaintiff could not have submitted these reports to Defendant's management in 2002.

[14]As noted earlier, a majority of the 2001 expense reports in the record are dated January 2, 2003. A few reports are undated, however, and the report for July of 2001 appears to be dated January 2, 2002. At a minimum, then, it is accurate to say that no report in the record bears a date consistent with the contention that it was submitted within a month of the date the expenses were incurred.

25

fact as to Defendant's contention, properly supported by citation to the record, that Plaintiff did not submit his 2001 expense reports within the one-month period called for under the parties' contract.

This leaves only Plaintiff's legal argument that his untimely submission of these reports does not justify Defendant's refusal to pay the expenses claimed in the reports, either because the parties' contract did not permit this remedy or because Defendant waived its right to insist upon timely submissions.  As to the former, the contract plainly conditions Defendant's payment of compensation and expenses upon Plaintiff's timely submission of documentation supporting these payments, providing that Plaintiff "shall submit" the requisite statements of his consulting services and expenses "[a]t the end of each two-week or one-month period," and that, "[w]ithin thirty days from such submission, the Company shall remit to the Contractor, his fee and reimbursed expenses." (Defendant's Motion, Ex. 1, Contractor Consulting Agreement at 2.)  The contract then reiterates this point, stating that "[f]or the company to make reimbursement for expenses they must, to the extent reasonable, be supported by documentation ***and be in accordance with the provisions of this paragraph,***" (id. (emphasis added)) — provisions that include, of course, the requirement of timely submission "[a]t the end of each two-week or one-month period."  Consequently, Defendant was entitled to insist upon timely submission of expense reports as a prerequisite to payment of the corresponding expenses.

Plaintiff's claim of waiver also is defeated by the plain language of the contract. In support of this contention, Plaintiff states that "at times" Defendant asked him to

26

refrain from submitting monthly expense reports because of the company's "cash flow" concerns, and he further states that Defendant sometimes failed to meet its contractual obligation to reimburse his expenses within thirty days after the submission of a report. (See Plaintiff's Response, Ex. 1, Plaintiff's Aff at ¶ 20.)  The parties' contract expressly provided, however, that its terms could not be "waived . . . except in writing, signed by the parties," and that "[n]o waiver of a breach of any term or condition of this Agreement shall be deemed to constitute the waiver of any other breach of the same or any other term or condition."  (Defendant's Motion, Ex. 1, Contractor Consulting Agreement at 4.) Thus, any breach of the contract's provisions by Defendant did not relieve Plaintiff of his obligations under the agreement.  Nor did Defendant's occasional waiver of the requirement of timely submission over the seven-year term of the contract operate as a general waiver of this condition, particularly where Plaintiff does not contend that his 2001 expense reports were encompassed within any such waiver.  Accordingly, the Court finds no basis to exempt Plaintiff's 2001 expense reports from the contractual requirement of timely submission.[15]

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's motion for

---

[15]The Court notes that Plaintiff has advanced only a breach-of-contract claim in his complaint, and has not sought to recover the 2001 expenses under any sort of equitable theory. Accordingly, the Court expresses no view as to whether any such theory might have provided an alternative basis for seeking reimbursement of these expenses.

partial summary judgment is GRANTED.

                              s/Gerald E. Rosen_____
                              Gerald E. Rosen
                              United States District Judge

Dated: September 14, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on September 14, 2006, by electronic and/or ordinary mail.

                              s/LaShawn R. Saulsberry_____
                              Case Manager

28